MARY K. SMITH, by her guardian,

*v.*

BARKER GUMMERE et al., admrs. &c., et al.

The defendants' intestate was appointed general guardian of complainant, his granddaughter, in February, 1865, and special guardian to sell some of her lands in July, 1865, and he gave sureties in each capacity. He sold those lands but never rendered any account of the proceeds, nor of his disposition thereof after his report of the investment thereof, made soon after they came to his hands, and never filed any account as general or special guardian. His ward, who was born in 1863, always lived with him thereafter. He died insolvent in 1881. On exceptions to a master's report as to the allowances to and charges by the guardian, and as to his sureties' respective liabilities—*Held*, that the cost of furniture purchased for and used by the ward should be allowed ; that the time when she was absent from his house during her school vacation should be deducted from his charge for board ; that he should be charged with the amount of rent he would have received from the ward's house if he had kept it in tenantable condition ; that the report of the sale (not carried out) of that property, signed by him, although never filed, was competent evidence as to the terms &c. of that sale to charge him with rent for the property ; that he should be charged with interest annually on the amounts originally received by him as general guardian, and interest on the rents, but

the proceeds of the sale of the lands should not be included therein, nor the interest on those proceeds, because, for them, his sureties as special guardian are solely responsible, since he never obtained any direction from the court to transfer those proceeds to his account as general guardian. The proper credits for board, clothing, pin-money, wages of a nurse, and for taxes, under the circumstances, fixed—*Held, also,* that the special guardianship fund is entitled to no part of the allowance for board, clothing &c., unless the amount of those allowances should prove greater than the debits of the general account, in which event the excess should be credited on the account of the special guardianship.

Bill for relief. On exceptions to master's report.

*Mr. G. S. Cannon, Mr. Mercer Beasley* and *Mr. E. T. Green,* for complainant.

*Mr. J. S. Aitkin,* for the surviving administrator.

*Mr. James Buchanan* and *Mr. A. G. Richey,* for W. J. Owens.

THE CHANCELLOR.

The bill is filed by Mary K. Smith, a minor, by General Mott, her guardian, against the administrators of her deceased guardian, her grandfather, Fredcrick Kingman, Esq., and his sureties in two bonds, one given as her general guardian and the other as her special guardian, appointed in proceedings in this court for the sale of land of hers at Edgewater in this state. The defendants, Samuel K. Wilson and Jonathan Steward, are the sureties in the bond given as general guardian, and Mr. Steward and William J. Owens are the sureties in the other. The object of the bill is to ascertain what amount is due to the complainant on each account, and to collect the amount by these proceedings from the sureties, the guardian having died insolvent. He was appointed general guardian February 9th, 1865, and special guardian July 3d, 1865. He never filed any inventory or account of his general guardianship, and made no report in the special guardianship after that in which he reported that he had invested $7,000 of the proceeds of the sale of the land ($7,200) in United States treasury notes of the second and third series of the seven-

thirty loan. The ward was born in Mr. Kingman's house,. August 28th, 1863. Her mother died two days afterwards, and her father, who was Lieutenant-Commander Watson Smith, of the United States navy, died December 19th, 1864, when she was about one year and four months old. As general guardian Mr. Kingman received $2,829.79 · from the administrators of her father, besides prize and pension-money from the United States government. He also collected the rent of a house and lot of hers (called in the proceedings the Lamberton property) on the corner of Second and Lalor streets in the sixth ward of Trenton. As special guardian he received the proceeds of the sale of the Edgewater property, $7,200, subject to the payment of the costs and expenses of the proceedings and his commissions. He appears to have made no investment of any of the money of the minor other than that before referred to, except that on the 31st of March, 1875, he took an assignment to himself, as guardian of the complainant, of a mortgage for $5,000 on his own dwelling-house in Trenton, subject to which mortgage he about a year previously had bought the property. On the envelope in which the bond and mortgage were enclosed, he wrote the word "canceled." They were not, in fact, canceled, but were valid securities at the time of his death. He died March 28th, 1881, and General Mott was appointed, in his stead, general guardian April 5th, 1881, and special guardian on March 14th, 1882. Mr. Kingman has left no account of either of the trusts,. nor anything from which his dealings with them or either of them or the property thereof can . be ascertained. By the order· of reference in this cause, the master was directed to take and state an account as fully and as far as practicable, between the complainant and the administrators, of the moneys of the former which were in Mr. Kingman's hands as her guardian, and any investments, earnings or increase thereof, and to state a separate account, if practicable, of the disposition and investment by him of the respective funds received by him as general and as special guardian, and of the earnings or increase of those funds respectively, and to state an account of all Mr. Kingman's dis- . bursements for the ward's support or benefit, and of all allow--

Smith *v.* Gummere.

ances to which his estate is entitled on those accounts. He reported that Mr. Kingman's estate should be allowed for the board and maintenance of the ward $5 a week for the period between .1865 and 1870, $6 a .week from 1870 to 1879, and $7.50 a week after the last-named year; that he had made the following deductions for absence: In 1874 five months, in 1875 nine months, and in 1878 six months, and had allowed nothing for the board and maintenance of the ward in 1881, because she was not at Mr. Kingman's house in that year. He reported, also, that he had allowed for the board and wages of a nurse for one year, and that he found due from the guardian's estate on the 15th of March, 1882, on account of the general guardianship, $12,556.50, and on account of the special guardianship, $7,003.97, the latter sum being the price for which the Edgewater property was sold, after deducting costs, expenses and commissions. He also reported that in stating an account of the interest-money received by Mr. Kingman as general guardian, he had assumed that all the interest money received by him (whether on the one account or the other) had been received as general guardian, and had been used, so far as necessary, in the care, maintenance and education of the ward.

Exceptions to the report were filed by the complainant, by the surviving administrator of Mr. Kingman and by Mr. Owens, one of the sureties on the bond given by Mr. Kingman as special guardian. The complainant filed eleven exceptions, the administrator fourteen and Mr. Owens nominally four, but actually fifteen.

As to the complainant's exceptions, the first challenges the propriety of an allowance of $40.63, the amount of a bill of furniture (a bureau, a child's table and a bedstead), bought in 1869 by the guardian for the sole use of the ward. The exception states that the ward had at that time, in her guardian's house, a large quantity of furniture which she had derived from her father's estate, and which was sufficient for her use. There is, however, no proof on that subject. Under the circumstances it was proper to allow the amount of the bill. It appears by the testimony of the ward's aunt, Mr. Kingman's daughter, that after

the guardian's death the ward gave away the child's table (it cost only $1.63) as a present to a little cousin of hers, and took away with her the bureau and the bedstead. Those articles were purchased for her comfort, and undoubtedly were necessary for her. It is to be borne in mind that she was not a boarder in a boarding-house, nor was she among strangers. A boarding-house keeper is bound to furnish the necessary articles of furniture for the use of the boarder. But here the orphan child was kindly furnished with a home in her grandfather's house, and it seems quite proper to allow, in the guardian's account, the cost of the articles in question, which were bought for her special use and to promote her comfort and convenience there. The table, it may be remarked, would seem to have been a toy.

The second and third exceptions are, that the master has not charged the amount of certain prize-money received by the guardian in 1874 and 1875 from the administrator of the ward's father in two payments, one $504.38, July 4th, 1874, and the other $256.07, November 20th, 1875. These exceptions are sustained. The amounts should be entered on the debit side of the account.

The fourth and fifth exceptions are based on a mistake, and were abandoned on the hearing.

The sixth is an objection that the amount of pension-money with which the master has charged the guardian for 1879 is less than the amount received. The exception is well taken. The amount should be $280.60, instead of $255. There is an error of $25.60.

The seventh exception is, that the master in charging the ward for board in the years 1871, 1872, 1873, 1876, 1877, 1879 and 1880, has made no deductions for her absences from the guardian's house in those years. General Mott testifies that from 1871 to 1881 she was at his house as a visitor, during her vacations, from ten to twelve weeks in each year. He also says that from 1877 to 1881 she spent part of every week—that is, from Friday to Monday—at his house. There should be a deduction for ten weeks' vacation in each of the years mentioned in the exceptions, but not for the weekly visits.

The eighth exception is, that the master has made no deduction for absence of the ward in 1880, but has allowed the guardian for her board for the entire year.  The exception is well taken. The proof is from the testimony of General Mott (and it is supported by that of Mrs. Welling on the subject) that the ward was away from the guardian's house for nine months of that year.    The former testifies that her washing for the whole of the year was done at his house.  The charge should be for only three months' board in that year.

The ninth is, that the master has credited the guardian with $90 for pocket-money for the ward for 1881.  Among the items, on the credit side of the account for that year, is one of $75 without prefix, or any statement or indication as to what it is for, and the other is for "allowance, $15."  These two constitute the supposed allowance of $90 for pocket-money to which objection is made by the exception.  It is suggested that the master intended to allow the $75 for clothing for that year, but there is no evidence of it.  In 1881, from the beginning of the year up to within a day or two of her guardian's death, the ward was living with General Mott.  The master has therefore allowed nothing for her board.  The item of $75 should be stricken out, but there should be a credit of $30 for clothing for that year, and the allowance of $15 should stand.

The tenth exception is, that the master has not charged the account with the rent of the Lamberton property for two years and a half of the period between 1874 and 1878.  He has charged no rent for any part of the period between those years; so that there is not only no charge for rent for two years and a half of the time, but there is none for any part of the whole four years.  The evidence shows that the property was unoccupied for some months before March, 1875, when a man named Lacy took possession of the premises under an agreement between him and the guardian for the sale of the property to him.  The reason why it was not rented appears to have been that it was so much out of repair.  It was the duty of the guardian to put it in tenantable condition.  He had the means to do so.  He let Lacy into possession under the contract.  That agreement was made

on the 2d of March, 1875, and stipulated for the delivery of the deed on the 1st of April then next, provided the guardian should be able to obtain authority from this court to make the conveyance. It appears, by a report of sale of the property to Lacy under proceedings in this court, made in April, 1877 (the order for sale was made in the same month), that the agreement was that Lacy was to pay $2,250 for the property, of which sum $850 were to be paid in cash, and for the remaining $1,400 he was to give a mortgage, the interest whereon, up to the time of giving the deed, he was to pay in lieu of rent, and the interest on the balance of the purchase-money was to be allowed him for the repairs necessary to make the premises tenantable. The report also states that Lacy had occupied the property under the agreement to the date of the report, April 26th, 1877, and had paid the interest on the mortgage in lieu of the rent from the 1st of April, 1875. The interest on $2,250 for those two years was $315 (the legal rate at that time was seven per cent. per annum), and for this the guardian is clearly chargeable. The report was never filed, but it is signed by him as guardian. It was offered in evidence, as appears by the record, but was objected to, and was not marked as an exhibit. It is competent evidence as an admission on the part of the guardian as to the sale and the terms of it, and that he had received the interest in lieu of rent. The repairs appear to have been made by Lacy. Mr. Hawk testifies that they cost Lacy $500 or $600. Without the evidence of the paper just alluded to, the guardian would, under the circumstances, be liable for the rent. No excuse is offered or appears, except from that instrument, for permitting Lacy to occupy the property for two years without paying rent. It appears that Lacy did not take the property. He rented it to another person, one De la Rionda, in June, 1877, who occupied it until October of that year. The guardian should be charged with $50 for the rent for that time also. It will have been seen that no charge is made for the year between April, 1874, and April, 1875. It is proved that the guardian lost some of the rent due from tenants, and losses to the amount of about $96 are sworn to by Mr. William L. Ashmore, but he cannot say that the money was not

3

eventually collected by Mr. Kingman. Compensation for non-allowance in respect to such moneys is found in the fact that no charge is made for rents for 1874, and there is the further consideration on this head that there is no clear proof as to what rent the guardian received for much of the time, nor as to what rent, if any, he failed ultimately to collect. In the absence of any account on the part of the guardian, the presumptions are against him. But, further, the master has charged rent at the rate of only $100 a year from January 1st, 1865, to April 1st, 1874. Now, it is by no means clear that the guardian did not receive a much larger amount than that. In 1878 he rented the property to Hendrickson at $120 a year, and it seems very clear, from entries in one of his books, that he rented it for $150 a year in 1865. It is quite probable that, if the facts were known, a full compensation for all losses would be found in the difference between the rent actually received and the amount charged by the master, to say nothing of the fact before mentioned in this connection that no charge is made for 1874.

The eleventh and last exception on the part of the complainant is, that the master allowed $150 for clothing for the ward, in 1880, although it appears that there is an unpaid bill of $43.18 for clothing of the ward for that year, which the present guardian is called upon to pay. The amount of that bill should be deducted from the $150, and the credit should be for $106.82, instead of that sum.

To consider the exceptions on the part of the surviving administrator:

The first and second, taken together, are that the master has erroneously charged the estate of the guardian with interest on annual balances, and that those balances are erroneously made up, and also that he has improperly included in the account of the general guardianship the interest on the proceeds of the sale of the Edgewater property. The guardian should be charged with interest on annual balances, but otherwise the objections are well taken. The guardian received, as general guardian, the following moneys of his ward during the first year: from the administrator of her father, $2,829.79; pension, $255, and rent

of the before-mentioned property in Trenton, at least $100; altogether, $3,184.79.   Under the circumstances, he is chargeable with interest on the money from the time it came to his hands, and the master has so charged him.   The master has also charged him with five and a half months' interest on $7,003.97, the net proceeds of the sale of the Edgewater property, $7,000 of which, according to Mr. Kingman's report in his special guardianship, made, as before stated, July 29th, 1865, he had invested in government securities.   But had that interest actually been in Mr. Kingman's hands at that time, as it well may have been, he could not lawfully have applied it to the purposes of his general guardianship.   He was accountable to this court for that money, and had given security to it for the just and faithful performance of the trust reposed in him as special guardian in reference to that fund, and for his observance of such orders as the chancellor should, from time to time, make in the premises in relation to that trust.   He could not have obtained authority to make such application of the interest to the purposes of the general guardianship, except by formal application to this court for the payment of the funds of the special guardianship to him as general guardian.   The statute requires that, in granting such applications, the chancellor shall see to it that proper security is given before making the order.   *Rev. p. 483* § *10.*   And, if he be satisfied as to the security, still it is discretionary with him whether to make the order or not.   *In re Anderson, 2 C. E. Gr. 536.*   Mr. Kingman never obtained such an order.   To have paid out the money for the purposes of the general guardianship, without authority, would have been a breach of his duty as special guardian, for which his sureties on the bond given to this court would have been liable to answer.   To charge his account as general guardian now with the interest which he received, or should have received as special guardian, is to make his sureties on his bond as general guardian liable for money which he never received on that account, and for which he was bound to answer to this court, and for which his sureties on his bond as special guardian are liable.   In fact, he may never have received the interest in question at all.   If he sold the government bonds the

next day after he made his report, and never re-invested the
money, but used it for his own purposes, he had not the interest
to apply to the purposes of the general guardianship. Under
such circumstances, to charge his account as general guardian
with the interest, is to charge his sureties in that matter with the
damages for his breach of duty in the other trust, and to shift
the burden of liability from the shoulders of the sureties on his
bond as special guardian to those of the sureties on the other
bond. As the account is now stated, the sureties on the bond
given for the special guardianship are relieved of all responsi-
bility for the interest on the fund and the liability transferred to
the sureties on the other bond. The accounts must be restated.
The restatement will render necessary a new calculation of the
interest on the annual balances.

The third exception is, that the master has made an insufficient
allowance for the board of the ward in each year. He has al-
lowed from 1865, when she was about two years old, to 1870,
when she was about seven, $5 a week; from 1870 to 1879—
that is, from about the age of seven to sixteen—$6 a week; and
after 1879, $7.50 a week. He has also allowed $260 for the
board and wages of a nurse for her for the first year. At the
end of that year the ward was about two and a half years old.
The allowance seems to me to be sufficient under the circum-
stances. The ward, indeed, had at her grandfather's house ad-
vantages which she could not have had anywhere else. She had
kind attentions on the part of her relatives, and had the benefit
and pleasure of a home with a family of refinement. Neverthe-
less, the allowance seems to be sufficient. It was her good for-
tune to find a home with her relatives, as it undoubtedly was
their pleasure to extend to her, in her orphaned condition, that
tender attention which affection gladly bestows, but which money
cannot buy.

The fourth exception is, that the master has made an insuffi-
cient allowance for the clothing of the ward. He has allowed
nothing for 1865; $50 a year for 1866 and 1867; $75 a year
for 1868 and 1869; $100 a year for the next four years; $125
a year for the next three years; and $150 a year for the rest of

the time. The allowance, so far as made, seems to me to be reasonable, but there should be an allowance of $30 for clothing in 1865.

The fifth exception is, to the non-allowance for the wages and board of a nurse for the ward after 1865. The proof is, that a nurse was kept for her, exclusively, during the first year (1865), and the master has allowed $247 for the board and wages of the nurse for that year. That allowance is proper, and is all that the evidence will warrant.

The sixth exception objects to the non-allowance in the credits for board, care, maintenance, room-rent and guardianship of the ward for time during which she was absent from home. This matter was considered and disposed of under the complainant's seventh exception. The exception is overruled.

The seventh exception, which is to the non-allowance of compensation for the use by the ward in her instructions in music in the guardian's house, of a piano belonging to him, cannot be sustained.

The eighth exception is to the non-allowance of any sum for music, books and stationery in 1879. There should be an allowance of $15 on that account. There appears to be no reason for omitting the allowance for that year.

The ninth exception is to the non-allowance for the years from 1871 to 1881 for pin-money furnished by the guardian to the ward. The proof is that he furnished such money to her. The objection should be sustained, and there should be an allowance of $12 a year from 1869, when she was six years old, to 1877, including the latter year, and $60 a year from 1878 to 1880, both inclusive, and, as before adjudged, $15 for 1881.

The tenth exception alleges that the master has omitted to make due allowance for taxes paid by the guardian on the ward's property for 1877, 1878, 1879 and 1880. The objection is well founded. The guardian appears by the vouchers to have paid taxes on the Lamberton property for those years as follows : For 1877, $22.50; for 1878, $19.12; for 1879, $19.13, and for 1880 the same amount. He paid, also, in 1869, $28.13 for taxes on the same property, which are not credited but should be

allowed. It appears by an examination of the vouchers that there are errors in some of the credits for taxes. Instead of the credit of $28.13 in each of the years 1871, 1872 and 1873, there should be a credit of $34.50 in each year. Instead of the allowance of $34.50 for taxes in 1874 and 1875, the allowance in each year should be of $28.13, and instead of $25.50 in 1876, the credit should be of $22.50.

The eleventh exception is on the ground that the master has made no allowance for losses in the collection of rents for the Lamberton house, and hence has overcharged the guardian for those rents. This subject was dealt with under the tenth exception on the part of the complainant. The exception is overruled.

The twelfth exception is based on the allegation that the master, while he has charged the account with the rents of the Lamberton property, has not allowed for the taxes paid. Some of the taxes were allowed, but, as before stated, others were not. The errors on this head were pointed out under the tenth exception on the part of the complainant.

The thirteenth exception is an objection to the master's charge of interest on the rents of the Lamberton property. It alleges that he has erroneously charged interest, and (if interest be chargeable) on an incorrect amount, and for an improper length of time. It should be remarked that in the account "the rents of that property should constitute part of the charges in the years in which they are held to have been received, and not as in the account under consideration, be segregated in a separate statement and the balance only taken into the account at the end." The objection is not well founded. It has already been said that the master has charged too small an amount of rents. As to the charge of interest on rents, he has in fact charged far too little. On $759.35 collected between January 1st, 1865, and April 1st, 1874, he has charged interest for only four and five-eighths years, instead of for the whole time since the rents were collected, as he should have done. He has also charged too little interest on the rest of the rent.

The last, the fourteenth, exception is a general one that the balance reported against the guardian is too great. Since the

account must be restated it is unnecessary to pass upon this exception.

It remains to consider the exceptions filed by Mr. Owens. His first exception is an adoption of the first, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth and thirteenth exceptions of the administrator. They have, therefore, been considered and passed upon. The first, fourth, eighth, ninth, tenth and twelfth were allowed, and the others overruled.

The second exception is that the master has not credited the fund of the special guardianship with any of the allowances for board, clothing, attendance or money furnished by the general guardian to or for the ward, but has credited all of them to the account of the general guardianship. It has already been said that the master ought not to have taken the moneys of the special guardianship fund into the account of the general guardianship. For the same reason the special guardianship fund is entitled to no credit on account of the allowances mentioned in this exception, unless it should prove that the amount of those allowances is greater than the debits of the general guardianship account, in which case equity would require that the excess be credited on the account of the special guardianship.

The next exception is that the master credited the amount of the before-mentioned mortgage entirely to the account of the general guardianship, and no part of it to the other fund. When the accounts are properly made up, it can then be seen where that mortgage should be credited, but it cannot be told before that time. There is no evidence to show out of which fund the money invested in the mortgage was taken. The investment took place in 1875, ten years after the special guardian's report of the investment of the money derived from the sale of the Edgewater property in government securities was made. An equitable application of it must be made, but it is impossible to make such application before the true state of the accounts of the general guardianship is ascertained.

The last exception is of a general character—that the balance found to be due on the special guardianship account is too great. The master has charged the special guardianship with only the

principal of the investment in government bonds. That is too little. He should have charged it with the interest also. The exception is overruled.

The report will be sent back to the master with directions to restate the accounts in accordance with the views expressed in this opinion. Of the complainant's exceptions, eleven in number, nine are sustained and two overruled. Of those of the administrator, fourteen in number, six are sustained and seven overruled. One is not passed upon. Of those of Mr. Owens, which are practically fifteen in number, for his first exception adopts twelve of those of the administrator, seven are allowed and eight overruled.